THE MUNICIPAL ASSEMBLY OF JUNCOS, Complainant and Respondent, v. AGAPITO GONZÁLEZ, MAYOR OF JUNCOS, Defendant and Petitioner.

No. 10. Argued July 13, 1939.—Decided November 7, 1939.

528

*Francisco González Fagundo* for appellant.   *J. Valldejuly Rodríguez* for appellee.

Mr. Justice De Jesús delivered the opinion of the Court.

This appeal was filed by Agapito González against a decision of the Municipal Assembly dismissing him as Mayor of Juncos as a result of charges preferred by the Assemblymen Antonio Sierra and Juan B. Vélez.

The charges preferred by Antonio Sierra were sworn to on December 16, 1938, and are as follows:

(A) Having ordered the filling out of a prescription valued at $4.50 for Germán Calcaño, (an employee of the Municipality of Juncos at $60.00 a month) to be charged to the fund of Public Charity, the same having been filled on November 30, 1938, and the official warrant No. 626 issued.

(B) Not having complied with the recommendation made to him by the Municipal Assembly of Juncos in its extraordinary session of August 16 of last year to the effect that the lumber, zinc and other building materials left over after the termination of the work in the aqueduct should be used to construct an athletic park and that he did not only fail

to construct said park but that due to his negligence, he permitted said building materials which had a value of $410, to disappear, thereby prejudicing the Municipality of Juncos in that amount.

(C) Because said Mayor of Juncos negligently and to the prejudice of the administration has not taken the necessary steps for the construction of the municipal slaughter house, market, enlargement of the municipal hospital, construction of streets and the enlargement of the sewerage system although he was ordered to carry out said construction and the necessary funds have existed since November 8, 1937, by virtue of a loan made from the Banco de Ponce.

(D) Having ordered stricken from the books of the municipality the debts appearing against the houses of Juan Vázquez and Candelario Vázquez Morales so that while they were paying the debt of $104.50 for water used, they should continue to use it gratuitously until they had paid said debt in its entirety and having also ordered the municipal authorities in charge of the aqueduct not to take any action whatsoever in regard to cutting off the service of water without his knowledge and approval.

(E) Having ordered the municipal employee Anselmo Cruz not to obey the order given him to cut off the service of water from Houses No. 21 of Almodóvar Street and No. 15 of Agueinaba Street belonging to Candelario Vázquez, and the houses of Juan Vázquez in No. 17 Agueinaba Street and No. 8 Escuté Street, which owed large amounts to the Municipality of Juncos, ordering said employee to report to the Municipal Treasurer of Juncos that the service had been cut off, this not being true, thereby falsely representing that said employee had obeyed the order received in prejudice to the interests of the administration.

(F) Because due to the attitude of the mayor, there are innumerable properties in Juncos using the water service gratuitously, the mayor obstructing those in charge of the administration of the aqueduct from carrying out their duties

of collecting for the water and entering the amounts in the municipal funds or from cutting off the service from those properties which do not pay for the same.

The charge preferred by Juan Vélez on the 27 of the same month states substantially as follows:

That from January 18 to February 5, 1937, approximately, the mayor turned over the title of his two commercial establishments to the name of his brother-in-law Justo Lozano and that in those two establishments all the purchases of the municipal hospital and school lunch rooms of the city are being made.

In due time the defendant answered all of the charges preferred. In regard to those preferred by Antonio Sierra, he answered substantially in the following terms:

1. In regard to charge A, the mayor accepted that on the date alleged, he ordered the prescription filled, valued at $4.50, to be charged to the municipality, because Germán Calcaño only received a weekly salary of twelve or fourteen dollars, was insolvent and a large family was dependent on him for its support; that on that date Calcaño's wife and two of his children were seriously ill, that upon Calcaño informing him his condition and upon explaining that he was in need of the medicines that were indispensable for the recovery of his wife and children, "this being a case of an insolvent and one of real charitable merits, where the lives of human beings were at stake, the respondent ordered the filling out gratuitously of the prescription." That upon doing that, he acted within the scope of his faculties, it not being his intention to defraud the Municipality of Juncos.

2. Referring to charge B, he accepted that the Municipal Assembly made him the recommendation to which said charge refers; however, he denies said building materials have disappeared, on the contrary alleging that they consist of zinc shelters and wooden forms and they are being kept in a warehouse erected on the place where the construction (of the aqueduct) was carried out; that they are worth $300, and

that they were not used in the manner recommended. by the assembly: (a) because there is at present no appropriation and none existed then for the project, which consisted in the construction of an athletic park; (b) because the moving of said materials to town would have been more expensive than their actual value, considering that the place where they were stored was at a distance of ten kilometers, far away from town, and the road leading to that place was in a very bad shape; (c) because the mayor's intention was to use said materials in the building of a house for the watchman of the water-supply tank; and (d) because the municipality was not prepared to meet the expenses of said construction.

3. In answer to charge C, he denied having been negligent in the discharge of his official duties, on the contrary alleging that the preparation of the plans for the construction of the slaughter house and public market were submitted to the Department of the Interior in due time, that those of the slaughter house were not ready until the month of November, 1938, and those of the public market had not been delivered on the date said charges were answered, to wit, December 22, 1938. That as to the work concerning the municipal hospital, an auction had already been held and adjudication effected previous to the latter date and that soon the work would start. Referring to the "Construction of a Street", he alleged that the item of $1,111 appropriated for the construction of a new street was insufficient and that he had been active towards getting funds from the P.W.A., not only to construct the planned street, but also to make a general repair of all the streets of the community, his purpose being to make use of the appropriation of $1,100 in any other work beneficial to the municipality. As to the enlargement of the sewerage system, he alleged that the item of $3,400 appropriated for that work was insufficient and that his purpose was to make a transfer of the $1,100 for the construction of the street to the item of $3,400 and then start the sewerage system's works. Finally, respondent alleged that the delay

had caused no damage to the municipality and on the contrary, the Municipality of Juncos had gained.

4. The answer to charge D partially constitutes a denial which involves a negative pregnant and reads thus ". . . *respondent specifically denies that with calculated intent to defraud the funds of the Municipal Treasury of Juncos h̜e had ordered that the amounts that could be collected for water supplied to the houses of Juan Vázquez and Candelario Vázquez Morales be stricken from the books of accounts of the Municipality of Juncos."* He continued denying that he had given his consent to the effect that said gentlemen, nor any other person could get the water service free of charge; he denied having ordered that no action b̄e t̄aken to cut off the water supply for lack of payment. As a special defense he alleged that while respondent was acting as Director of Public Works, he ordered the Treasurer, that in the event it was necessary to cut off the water supply to any person, notice be given to him (respondent) in order to do it through the Inspector of Municipal Public Works, once that respondent had taken, with no practical results, all th̄e necessary steps t̄o collect the debt or as much of it as could be collected. He further alleged that on various occasions he had asked the Municipal Treasurer to render him monthly reports in regard to monthly payments and the former, in violation of law, never had rendered such reports.

5. He answered charge E with a general denial and alleged as a defense that Anselmo Cruz is his bitter enemy and that on various occasions he had threatened respondent because the latter had said to the Treasurer not to use Cruz in the disconnection of the water service and that when such disconnection was necessary, respondent be given notice so as to do it through the Inspector of Public Works, who was the one required to proceed in such a case.

6. Answering charge F, he denies "that on account of his attitude, there exist in the Municipality of Juncos a countless number of property owners making use of the water supply

service without paying for it'', or that he. has obstructed the aqueduct's administration, alleging on the contrary that he has always given his cooperation to the Municipal Treasurer as well as to those in charge of the collections for the supply of water, and that he has personally interviewed many persons owing water, doing his best by all the means available to effect the collection of as much as he can get.

As a ''special additional defense'' the defendant alleged:

''(a) That these charges are the result of a plot between the assemblyman who preferred them, Antonio Sierra, who is a bitter enemy of the mayor, his wife Elena Castro de Sierra who is also a member of the assembly, both being the parents of the Municipal Treasurer, Petra Sierra de Romero, and these charges have been inspired by said Municipal Treasurer since she preferred charges analogous to the present and filed them before the Municipal Assembly of Juncos against the defendant on previous occasions and the assembly took no action in regard to said charges.

''(b) That the said charges are also the result of a conspiracy of the Assemblymen Octavio Santos, Antonio Sierra, Elena Castro de Sierra, Jesús González Díaz, Dolores Ortiz de García and Román Sánchez Ocasio, who are bitter enemies of the defendant and the defendant also alleges that the Assemblyman Jesús González Díaz on the 19th of the present month stated to Pepín Pereira in the presence of Maximino Delgado, in the commercial establishment of Pablo Colón, situated in Corchado Street of Juncos, that the municipal assembly was all against the mayor and would agree to remove him and that he was sure that the mayor would be removed as a result of these proceedings and that the mayor would have to take the matter to the Supreme Court, since he would lose it before the assembly. In the same manner the defendant alleges that the said Assemblyman Jesús González, on the 16th of the present month and on the afternoon of said day (he refers to the month of December, 1938) before the session of the municipal assembly which took place that night was held, and in the place known as 'El Caracol' of Juncos, he made public manifestations before a great number of people in the sense that the Mayor of Juncos, herein defendant would have his salary suspended in a session to be held that same night by the municipal assembly and that he would finally be removed from office by virtue of these proceedings.''

In answer to the "additional charge" preferred by the assemblyman Juan B. Vélez, the defendant stated as follows:

"That he has today been notified of the so called additional charge for the purpose of 'beginning removal proceedings' filed on the night of December 27, 1938, in the Municipal Assembly of Juncos, Puerto Rico, by the Assemblyman Juan B. Vélez and the defendant wishes now, without waiving the jurisdictional question which he has raised in these proceedings nor any other privileged questions which he has presented, to answer said additional charge as follows:

"That on or about December, 1936, the defendant, who at that time was the owner of two commercial establishments situated in the Municipality of Juncos, agreed with his brother-in-law, Justo Lozana to sell the same to him. That they prepared the corresponding inventory and that the sale was carried out and the internal revenue licenses were asked for and obtained towards the end of December, 1936; that from said date until the present the said commercial establishments have belonged to and are the exclusive property of Justo Lozano and that defendant has no participation or right whatsoever in the same nor has he anything to do with the said establishments.

"The defendant denies that there is any proceeding whatsoever pending before the Attorney General of Puerto Rico of which he has been notified against him for the reasons before stated and that if said proceeding does exist, the defendant has never had knowledge of the same.

"As a special defense, the defendant alleges that the Assemblyman Juan B. Vélez is his bitter enemy and is prejudiced against the mayor and he also alleges that such charge is neither more nor less than a conspiracy by the said assemblyman and other members of the Municipal Assembly of Juncos in order to obtain at any cost the removal of the defendant as Mayor of Juncos. The defendant also alleges that the assemblyman Dolores Ortiz García on the 27th of the present month, at about 1:00 o'clock in the afternoon, on Escuté Street, stated in a loud tone voice before various people the following: 'Tonight we have a meeting to prefer charges against the mayor and to kick him and all his followers out.''

On the ninth of last January, the municipal assembly held the session at which ten of its eleven members were present and Attorney J. Valldejuli acted as counsel.

The defendant appeared represented by attorney.

Before the proof of the charges was begun, the defendant formally required the Assemblymen Antonio Sierra and Juan B. Vélez to abstain from acting as members of the assembly because they were the members who had preferred said charges. Said members refused to inhibit themselves. In view of this refusal, the defendant made a motion wherein he prayed that the assembly should not permit the intervention in the proof of the charges of the following assemblymen: Octavio Santos, Antonio Sierra, Elena Castro de Sierra, Jesús González Díaz, Dolores Ortiz de García and Román Sánchez Ocasio. He based his motion on the fact that of these assemblymen, some were his bitter enemies and others had made public manifestations showing that they were prejudiced against him. He also alleged that the preferment of these charges was the result of a conspiracy or plot of these assemblymen to remove him from office. He offered evidence consisting of the testimony of various witnesses in the sense that on several occasions they had heard certain assemblymen making the following or similar statements: "The assembly will hold session tonight to suspend the mayor. It will then have another session to remove him and he will have to appeal to the Supreme Court because the assembly will remove him." Another assemblyman was alleged to have said: "This mayor is a scoundrel because he has continued going to the city hall after his employment and salary has been suspended."

The assembly heard the evidence which the defendant presented to prove the allegations of his motion. The motion was denied.

Evidence was then introduced in regard to the charges, sessions being held for this purpose on the 9th and the 25th of January and on the 9th and 24th of February of this year and decision was rendered on the 15th of May last wherein by a majority vote each and every one of the charges

were held proved as a consequence of which the removal of defendant as Mayor of Juncos was decreed, with retroactive effect to the date on which he was suspended from employment and salary, to wit, December 16, 1938.

The defendant appealed to this Court, basing his appeal on four "Reasons of Fact" and six "Reasons of Law" which he states as follows:

### "REASONS OF FACT

"1. The petitioner has been deprived of the right to hold the position of Mayor of Juncos without due process of law and without his day in court because the hearing and opportunity to defend himself, was a farce authorized by the Municipal Assembly of Juncos merely in order to appear complying with the letter of the law, since the municipal assembly was prejudiced against petitioner and was moved by bias, prejudice and manifest partiality, since the members which were impugned by the mayor were agreed to do everything possible to remove him; and besides, said prejudice was so manifestly shown that of about seventy-five questions raised by said defendant in the different session before the assembly he did not obtain a single decision in his favor.

"2. The assembly declared the charges preferred against the mayor as proven, although the same were not upheld by competent or admissible evidence and decided the case against the evidence presented by the defendant, which evidence totally exhonerated the latter of said charges.

"3. At no moment during the hearing of this case was the existence of just cause of a substantial nature which would affect the rights or interest of The People of Puerto Rico shown and which would result in the removal of the defendant mayor, it appearing on the contrary, from the evidence presented by the petitioner (sic) that his acts were always correct, that there was no abandonment, excusable negligence nor immoral or incorrect conduct in the carrying out of his duties as Mayor of Juncos.

"4. The municipal assembly should have given credit to the evidence presented in regard to prejudice in requesting the inhibition of the assemblymen who preferred the charges and of others, since they were not in a position to judge with their minds free from prejudice the charges preferred by them against the mayor thereby violating the most rudimentary spirit of justice.

## "Reasons of Law

"1. The proceedings followed in this case are from the beginning null and contrary to the law, since the lawyer who was designated attorney of the Municipal Assembly of Juncos did not act as an attorney but as a prosecuting attorney, conducting said proceedings in all its details and the municipal assembly taking no part whatsoever except to decide the questions raised, the acts of said attorney being contrary to the spirit and purpose of the position of attorney. (See *In re Ortiz* v. *Venegas,* 43 P.R.R. 374.)

"2. Because the municipal assembly admitted incompetent, irrelevant, immaterial, and impertinent evidence, objected to in time by defendant, to sustain the charges in open violation of our Law of Evidence, all the decisions rendered by the assembly admitting said evidence—which decisions were promptly excepted to by the defendant mayor—being in consequence contrary to law.

"3. Because the acts alleged against the defendant in the first charges preferred, do not constitute a good and legitimate cause of action for proceedings of impeachment, it being an error on the part of the assembly not to so have held; the demurrers filed against said charges should have been granted.

"4. Because the so called 'additional charge' is not a charge nor does it state facts sufficient to constitute a cause of action nor does it contain statements of facts of any kind whatsoever to justify or be the basis of a procedure for impeachment, it being an error of the municipal assembly not to so hold. The demurrers filed against said charge should have been granted.

"5. The final decision of the municipal assembly removing the mayor in this case is null, has no valid or legal effect whatsoever and has been approved without jurisdiction for the following reasons:

"(a) Because said decision has not been approved by a majority of the members—read eleven members—of which the Municipal Assembly of Juncos is composed according to the provisions of Section 29 of the Municipal Law in force.

"(b) Because said decision does not make any holding whatsoever as to the guilt or innocence of the defendant and limits itself exclusively to condemning him and imposing judgment.

"6. Because the Municipal Assembly of Juncos acted without jurisdiction, since in the notice for the last session to decide the case, the same is called to meeting by the vice-president who has no authority to call said sessions according to law. (See *People Ex rel. Mendín* v. *Seijo,* 43 P.R.R. 352.) Said assembly also acted without

jurisdiction because some witnesses took the oath before the secretary of the assembly who has no authority to take said oath and others took no oath whatsoever. (*Branizar* v. *Mendín, Mayor*, 43 P.R.R. 27)."

We are not going to discuss the ten questions discussed by the appellant separately because we would incur in repetitions and we would unnecessarily extend this opinion. We will discuss the case generally and in said discussion we will consider the different points raised.

■■ Following the logical order of the questions raised we will begin by the request made to the Assemblymen Antonio Sierra and Juan B. Vélez that they abstain from taking part as judges in the matter because they were the authors of the charges to be decided.

This was a question to be addressed to the conscience of the assemblymen and they were the sole judges of their own capacity to intervene. If, after hearing the voice of their conscience, they believed that they could not' impartially try appellant, it was their duty to inhibit themselves. If notwithstanding the fact that' they had preferred the charges, they thought that they could decide them taking into consideration the evidence in support of the charges as well as that in favor of the appellant, that is to say, what resulted as a·whole from the evidence, in that event they were obliged to fulfill their official duties, among which is found that to try the mayor when charges are preferred against him. This is a subjective question and we are unable to decide if they acted correctly or incorrectly in not inhibiting themselves for the sole reason that they had preferred the charges. To this end it can be applied, *mutatis mutandi,* what was said in the case of *Ortiz* v. *Venegas,* 43 P.R.R. 374, 384:

"We do not mean to say that the mayor would be disqualified by the mere fact that he is the person bringing the charges against the officer. Certainly not. The mayor is the chief executive of the municipal administration and in the discharge of his duties he may obtain direct knowledge of acts performed by the officers appointed

by him which justify their removal; and in such cases, who can be in a better position than the mayor to decide the matter after hearing the officer's defense or having afforded him an opportunity to defend himself? The mayor does not act for his personal benefit, but in the interest of a good municipal administration.

"But when there are imputed facts of the character alleged in the motion for disqualification, the situation changes, and the officer should be given an opportunity to produce his evidence. Should such facts be established, the disqualification would be in order."

██ The assembly did not commit error either in dismissing defendant's motion in regard to not permitting the intervention of the aforesaid six assemblymen. The reason for this is that the assembly has no authority to estop one of its members from acting in a hearing wherein charges preferred are going to be proved. It is the duty of the assembly to try the defendant but not its members. Therefore, this was as we said before, a question to be decided only and exclusively by the assemblymen themselves. Of course, if what the defendant calls "evidence of prejudice" should show clearly that the assemblymen attacked should have refrained from acting and did not do so, this Court may reverse the decision of the assembly if it is of the opinion that the defendant has in fact been prejudiced by bias and partiality that said assemblymen may have had against him.

We have examined the "evidence of prejudice" and it does not convince the conscience of an impartial judge. The evidence of statements made by other people should be strong and robust and be accompanied by circumstances guarantying its authenticity since it is very easy to impute to another any statement and to say that nobody else heard it or that they do not know the other persons in whose presence it was made. This is exactly what happened in this case. The statements that Justo Lozano testified that were made to him by the Assemblyman Sierra, were only heard by him and if the fact that Lozano is the defendant's brother-in-law is taken into consideration and that the two stores which were alleged to belong to the mayor in the charges preferred, are

in his name, this testimony must be received with due caution. The other witnesses have not been corroborated either. They testified that the statements were made publicly and in the presence of various people, but although the witnesses have always been residents of Juncos and they know the inhab-itants of that city, generally they can remember no other people there present although they remember exactly the day, hour and place in which the statements were made.

It is true that the assembly was divided in all its decisions. The majority, presided by Octavio Santos, systematically upheld the attorney in all the questions raised in regard to the presentment of the evidence. The other group also systematically, voted in favor of the mayor and there were others who generally did not vote. But it is the truth that the defendant had the opportunity to present and presented all the evidence pertinent to his defense and analyzing impartially all the evidence that the assembly had before it, we must conclude that some of the charges were satisfactorily proven and that in no manner whatsoever could the result have been affected by any spirit of hostility which may have existed in the majority of the assembly towards the defendant mayor.

Let us take up the first charge. It is alleged that the defendant ordered that a prescription for the value of $4.50 for Germán Calcaño be filled and charged to the item of the destitute sick although Calcaño was the chauffeur of the municipal ambulance and was paid a salary amounting to $60.00 a month. The mayor does not deny the facts alleged in this first charge but he alleges that Calcaño, although he was paid a salary of $60 a month, had a large family which depended exclusively on him for its maintenance, that the defendant was informed that the prescription was for a child of Calcaño and that if said payment was illegal, the municipal auditor should have refused to make the payment which he did not do. The mayor argues that a person earning $60 has a right to be considered as poor and to receive medicines

gratis from the municipality. According to the evidence presented, the item for destitute sick of the Municipality of Juncos for that year was $150 and this was a circumstance which undoubtedly was not unknown to the mayor. This being so, we cannot understand how he could ignore that those $150 should be devoted to the necessities of the indigent sick and not be used to fill prescriptions for municipal employees with monthly salaries of $60. Assuming that the prescription was for a son or for the wife of Calcaño, the situation would be the same as if the sick person had been Calcaño himself, since in one or the other case he being the head of the family was bound to pay it and if the mayor wanted to be generous or charitable with that family, he could have done it out of his own pocket but not with public funds entrusted to him for the really needy sick. Those who by the nature of their position are in charge of public funds or properties are bound to administer them scrupulously using them strictly for the purposes authorized by the laws and rules in force. It is only in this manner that they live up to the confidence reposed in them.

In our opinion, this charge has been sufficiently proved and shows a complete lack of preoccupation towards his duties as mayor and it is not a defense whatsoever that he had no intention of defrauding the municipality. His conduct is not justified either by the fact that the auditor sanctioned his illegal act in not refusing to pay for the prescription since at most it might mean that the auditor as well as the mayor were *in pari delicto*.

Another charge, the truth of which we have no doubt, is the one preferred by Juan B. Vélez and which alleges that the mayor is the owner of two grocery stores that he has in the name of his brother-in-law Justo Lozano wherein the hospital and the school lunch room buy exclusively. The defendant himself testified that before being elected mayor he was the owner of said grocery stores and that on December 15, 1936, because he had to assume the duties of the municipal

administration and not being able to continue in business nor to take care of the stores, he turned them over to his brother-in-law, Justo Lozano, who was married to a sister of his. (T. of E. 172 and following). We have no doubt that the mayor did not ignore the fact that his position did not estop him from being the owner of one or more commercial establishments if they did not enter into contracts with the municipality and probably to evade this legal impediment he turned the title over to Justo Lozano as we will show further on.

From the evidence it appears conclusively that everything that was consumed in the municipal hospital and in the school lunch room including coal was bought exclusively in Lozano's store. It also appears that these purchases were made in obedience to orders of the mayor who, upon his attention being called to this irregularity, stated that he was forced to do this because he had spent a great deal of money in the election campaign but that after he had recuperated some of the money he had spent he would distribute the purchases among the other establishments of the locality. (T. of E. 217.)

It is sufficient to read the evidence relating to this charge to be completely convinced that during the year and a half previous to the delivery of title Justo Lozano did not have any business whatsoever and he was really the shield behind which the defendant was hiding. That is why the mayor said that he had to transfer the title of the stores because being mayor he could not also be in business. In the case of *Díaz v. Charneco*, 48 P.R.R. 521, 524, one of the six charges preferred against the mayor was that he had purchased groceries for the municipal hospital to be paid for from funds of the municipality in a certain commercial establishment in which he was directly interested, simulating that the contract had been made with another person. Referring to this charge this Court said:

"In support of this charge documentary and oral evidence was introduced. We have studied the evidence carefully and in our opinion it shows the truth of the charge. Notwithstanding the strong efforts of counsel for appellant in his brief to discredit the probative value of the evidence and in any event its sufficiency, the impression which an independent reading thereof produces upon the conscience of the judge is lasting. It is convincing to the effect that the establishment in question belonged to the mayor, or at least that the mayor was directly interested therein."

In the aforementioned case, the following paragraph from *People ex rel. Pérez* v. *Manescau,* 33 P.R.R. 703, 706, is cited with approval:

"That the execution by a public officer of a contract expressly prohibited by law and clearly contrary to public policy constitutes a violation of an official duty sufficient to produce a forfeiture of the office, seems to be evident. This is not an unconscious or unimportant violation of the law. Inasmuch as a recourse was had to simulation in order to elude the mandate of the law, the deliberate intention to infringe the law was manifest."

In the *Manescau* case the charge preferred alleged that a house belonging to an assemblyman had been rented by him to the municipality after simulating a transfer of the house to another person.

Assuming, without accepting it, that it had not been sufficiently proven that the defendant was the owner of the establishments in question, the fact that they belonged to his brother-in-law and that the defendant had knowledge of the monopoly that had been created in his favor, with the resulting prejudice to the municipality under his administration, by the purchase of all the necessities for the municipal hospital and the school lunch room in said establishments, constitutes an immorality on the part of the defendant which would sufficiently justify his removal.

The defendant attacks the sufficiency of the charges alleging that they do not constitute sufficient reason for his removal and that the assembly committed error in overruling the demurrers that he filed against them. A mere reading

544

of the charges shows that if any of them were true, the mayor should not continue to occupy said position. We should not lose sight of the fact that even though the assembly in hearing charges against a mayor is exercising quasi judicial functions, nevertheless it does not cease to be also an administrative board and in proceedings before said boards and commissions, the inflexibility characterizing judicial proceedings does not exist. Before said boards, the rules of procedure are more flexible.

A great liberality exists in the interpretation of the allegations as well as in the presentment of the evidence and if an injustice is not committed, evidence is admitted which would be refused by any court of justice. It is precisely due to the liberality in the procedure that the jurisdiction of said boards or administrative commissions is continually being augmented. See the work of James M. Landis, the present Dean of the Law School of Harvard University, entitled ''The Administrative Process'', page 20 et seq. See also the case of Ortiz v. Venegas, supra.

The defendant alleges that the decision by which he was removed, that is, the decision approved in the session held on May 15, 1939, is void, (a) because it does not declare the guilt or innocence of the defendant but limits itself to remove him from office; (b) because the assembly acted without jurisdiction, the session having been called by the vice-president who has no authority to make such a call; (c) because the final decision was not approved by the majority of the eleven members of which it is legally composed, and (d) because the witness who testified before it took the oath before the secretary of the assembly who has no authority to take such oaths.

In the certified copy of the decision of the assembly which was brought to this Court as a part of the evidence, it is stated in regard to each charge, that the evidence as a whole showed the truth of the facts alleged in each one of them. It repeats the facts alleged in each charge and ends removing

the defendant because it understands that each and every one of the charges had been proved. It is obvious that the decision of the assembly, declaring the charges to have been proven is equivalent to a finding of guilt.

When the mayor was suspended from his office and salary, he was substituted in office by the president of the assembly. Therefore, the latter acted with jurisdiction in as president of the assembly by the vice-president of the assembly. Therefore, the latter acted with jurisdiction in calling the assembly to session since at that moment he did not act as vice-president but as acting president of the said body.

The said decision appears to have been approved by the affirmative vote of Antonio Sierra, Dolores Ortiz de García, Jesús González Díaz, Elena Castro de Sierra, Juan Bautista Vélez and Octavio Santos, or that is, six of the eleven members of the assembly. Three voted against it and one did not vote. As six constitutes a majority of a body composed of eleven members, we must conclude that the attacked resolution was approved by a majority of the assembly.

According to the stipulation of the petitioner dated June 21 last, and approved by this Court two days later, the petitioner agreed to waive the allegation of error in regard to the taking of oath by the secretary of the assembly. Even though said stipulation had not existed, the allegation of error could not have been upheld since it does not appear from the record that the defendant at any moment opposed the taking of the oath to the witnesses by the secretary and this being so, his implicit acquiescence in not objecting then estops him from raising the question now before this Court. *Concensus tollit errorem.* See by analogy the cases of *The People* v. *García*, 18 P.R.R. 554; *The People* v. *Carrasquillo*, 22 P.R.R. 127; *The People* v. *Diodonet*, 22 P.R.R. 698; *People* v. *Marrero*, 25 P.R.R. 542; *People* v. *Rivera*, 25 P.R.R. 776; *People* v. *Soto*, 28 P.R.R. 864; *People* v. *Negrón*, 36 P.R.R. 113.

The case of *Branizar* v. *Mendín*, 43 P.R.R. 27, cited by the defendant, is not applicable to the present case. In said case a proceeding had before a mayor was annulled because the oath of the witnesses were taken before the municipal secretary notwithstanding the fact that the appellant objected on the ground that he had no authority to take such oath. In the syllabus error was committed in not stating that the appellant had opposed the taking of the oath by the secretary, but in the body of the opinion the following is said (page 28):

"In the case before us the mayor acquainted the plaintiff employee with the charges against him, but at the public hearing the witnesses were not examined under oath. We say that they were not so examined, because although the mayor ordered the witnesses to be sworn, the oaths were administered by the municipal secretary who had no authority to do so *and over the objection of the petitioner through his attorney.*"

There is nothing in the Municipal Law which denies an assembly the right to delegate in a lawyer to act as attorney and examine the witnesses and direct the proceedings. On the contrary, this is necessary in those cases in which the assembly does not have as one of its members, a person versed in the knowledge of the law. By not recurring to the aid of an attorney, the procedure before the assembly in the majority of cases would be a failure of justice. This does not mean that the attorney should become an adverse party to the official being tried.

His mission is not to obtain the removal of the defendant by any means possible but to present the true and legal evidence to the assembly, which shall consider it, as a whole, determining if the charges preferred have been proven.

Believing as we do that the two charges to which we have referred have been sufficiently proven and that the errors committed by the assembly cannot in any manner have affected the result and these two charges being sufficient to uphold the decision by which the defendant was removed from

office, we can prescind from the consideration of the other charges.

Therefore, the decision of the Municipal Assembly of Juncos of May 15, 1939, whereby the defendant was removed from his position as Mayor of Juncos, is affirmed.

Mr. Justice Travieso took no part in the decision of this case.

ON MOTION FOR REHEARING

Denied: November 28, 1939.

The defendant requests the reconsideration of our judgment of November 7, insisting that the decision of the Municipal Assembly of Juncos whereby he was removed as mayor and which was affirmed by this Court by said judgment, was not approved by the affirmative vote of the majority of the eleven members who constitute the Municipal Assembly of Juncos.

On the 13th of last July, the date set for the hearing of this case, the attorney for the defendant offered in evidence a copy of the minutes of the special session held by the Municipal Assembly of Juncos on May 15, 1939, in which the decision by which the mayor was removed was held. Said copy was certified to on petition of the defendant May 17, 1939.

Said certified copy was presented to prove, contrary to what appears from the record, that Octavio Santos, the acting president, did not vote on said decision and that therefore, it was approved by the vote of five and not six members as appears from the record sent by the municipal assembly. The certified copy offered by the defendant was admitted and the appellee was given until July 17, to present any document tending to impugn said certified copy. The appellee did so, filing another certified copy issued by the secretary of the municipal assembly from which it appears that the minutes of the special session of May 15, 1939, were approved by the municipal assembly in its extraordinary session of

548

May 19, 1939; which shows that at the time the certified copy which the defendant presented in evidence was issued to him the minutes of the meeting of May 15 had not been as yet approved by the assembly.

According to the certified copy presented by the defendant, which as we have seen, was prematurely issued, the following appears: That the acting president Octavio Santos called the session to order and the following voted affirmatively to remove the mayor, Antonio Sierra, Dolores Ortiz de García, Jesús González Díaz, Elena Castro de Sierra and Juan B. Vélez, and against it Santos Meléndez, Hermógenes Rivera and Manuel Lamb. Nothing is said in regard to the acting president of the assembly, Octavio Santos. In paragraph immediately following that in which the manner of voting the different assemblymen is specified, the following is said:

"The president informs that as a majority of the assembly has voted in favor of the approval of the resolution presented by the municipal assembly member, Dolores Ortiz García, it has been approved."

In no place in the minutes is it stated affirmatively that Santos did not vote. On the contrary, he himself appears stating that the majority of the assembly has voted in favor of the approval of the resolution presented to remove the mayor. We may presume that Santos knew that the majority of eleven, which is the number of members of which the municipal assembly is composed, is not five, which is the number of the assemblymen who would have voted in the affirmative if he had not voted. It also appears, as we have stated before, that the minutes of the session of May 15, were approved by the assembly in its extraordinary session of May 19, 1939, and attention is called to the fact that on the reverse side of the certified copy, upon certifying that said copy is a true and exact copy of the minutes, the secretary, Antonio Molina, refers to the session as that of May 5 and not as that of May 15th which in truth it was, which shows the haste with which the copy presented by the defendant was issued.

In contradiction to the aforesaid certified copy, from the record it appears that Santos voted affirmatively. This also appears from the certified copy presented later by the appellee, as follows:

"Said proposed resolution was duly seconded by the assemblyman Jesús González Díaz and by virtue thereof the president of the assembly calls for vote on said resolution with the following result:

"In the affirmative: Antonio Sierra, Dolores Ortiz de García, Jesús González Díaz, Elena Castro de Sierra, Juan B. Vélez *and the acting president of the municipal assembly, Octavio Santos.*

"In the negative: Santos Meléndez, Hermógenes Rivera and Manuel Lamb."

This being so, it is in perfect harmony with the following paragraph which appears from the certified copy presented by the defendant as well as in that presented by the appellee and which states as follows:

"The president informs that *as a majority of the assembly has voted in favor of the approval of the resolution* presented by the municipal assembly member, Dolores Ortiz García, it has been approved."

This takes us to the conclusion that if the name of the acting president, Octavio Santos, was omitted from the names of the members who voted affirmatively, it was a mere omission of the secretary of the assembly which was corrected in the later certified copy. The fact that on May 17, 1939, the date on which the certified copy which the defendant presented was issued, the name of Octavio Santos did not appear in the original minutes among those voting, is no impediment to a later amendment of said minutes adjusting them to the truth, since on May 17, the minutes of the session of May 15 had not been yet approved by the assembly and they were therefore susceptible of amendment.

The other questions raised in the motion for reconsideration have been sufficiently discussed in our opinion of November 7 and we have therefore nothing to add. The reconsideration requested is denied.